IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

IN RE:

AMBROSE CONSTRUCTION AND
ROUSTABOUT SERVICE, LLC,

Debtor.

Case No. 15- 13956
(Chapter 11)

## DECLARATION OF OMNI BUSINESS CONSULTANTS, LLC, IN SUPPORT OF AMBROSE CONSTRUCTION AND ROUSTABOUT SERVICE, LLC'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Darryle Cromwell, being duly sworn, deposes and states:

1.      I am the Managing Member of Omni Business Consultants, LLC, having an office at 16250 County Road 1565, Ada, Oklahoma 74820 ("OMNI").

2.      I hold a Masters of Business Administration from Queens University of Kingston, Ontario, Canada. I am a business consultant with experi ence in evaluation and reorganization of management structures, corporate organization, financial policies, and general business affairs to improve a company's efficiency and operations.

3.      Ambrose Construction and Roustabout Service, LLC ("Debtor") hired OMNI as a business consultant and Chief Restructuring Officer in approximately December of 2014.

4.      I have worked with the management team of Debtor on behalf of OMNI since that time on essentially a day to day basis, familiar with all aspects of the Debtor's affairs, including business operations, strategic planning, financial reporting, legal affairs and other relevant issues, including, but not limited to, the Debtors' efforts to address its

1

current financial difficulties, and its preparation for the transition into operation as chapter 11 debtor-in-possession.

5.    I have detailed, personal knowledge of, and am competent to testify about, the facts stated in this Declaration.  My testimony herein is based on my service to the Debtor, my review of the Debtor's books and records and other relevant documents, and my review of information compiled and communicated to me, at my request, by the Debtor's officers and employees.

6.    If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.

***Debtor's business:***

7.    Debtor is an Oklahoma Limited Liability Company established on April 24, 2009 with its primary place of business located in Payne County, Oklahoma.

8.    Debtor's core business is performing maintenance ("roustabout"), construction, trucking and specialty equipment supply service to its oilfield clients of Oklahoma, Texas and Kansas.

9.    Debtor began operations with a 1 ton truck, 1 trailer and a backhoe, all of which were operated by Steve Ambrose, Debtor's Manager, servicing the oilfield clients.

***Debtor's growth and historic performance:***

10.    Due to the previous strong price per barrel of oil, Debtor was able to profitably expand its supporting services to drive annual sales from approximately $2 million in 2011 to $15.9 million in 2014.

11.    The ever increasing and strong price per barrel of oil supported Debtor's actions to profitably expand supporting services. This in turn drove Debtor's annual sales from approximately $2 million in 2011 to $15.9 million in 2014.

12.    The results were driven by organic growth as well as acquisition.

13.    In February 2014 Debtor completed an asset share purchase/acquisition of Sooner Backhoe LLC ("Sooner") for $2.8 million. The purpose of the acquisition was to geographically expand Debtor's business operations to the panhandle of Oklahoma.

14.    The 2014 combined results of Debtor and Sooner delivered approximately $19 million in sales and pre-tax profits of $1.7 million in pre-tax income and a $3.2 million EBITDA (income before interest, tax, depreciation, and amortization) for calendar year 2014.

15.    In September 2014, at a time when the crude-oil prices were in the $80/barrel range, Debtor completed an asset purchase of Grizz Trucking assets, which were consolidated into Debtor's operations.

16.    In September 2014, Debtor entered into a Full Service Lease Agreement with Bruckner Leasing Company, Inc., for the lease of 11 Mack tractor/trailers.

17.    The increased services provided by Debtor and the Grizz Trucking asset acquisition increased the asset base of Debtor from $1 million to $6 million in the same period.

18.    At that time, the monthly free cash flow from Debtor and Sooner to service debt was approximately $266 thousand. However, the average monthly debt service for

both Debtor and Sooner was $295 thousand, resulting in a monthly cash shortfall of approximately $30 thousand.

19.  September to December 2014 saw crude prices continue to decline to below $50/barrel.

20.  This downward pricing trend caused Debtor's customers to reduce their own activities, which drove down oil field service prices charged by companies like Debtor, as well as the volume of work available to those service companies.

21.  In late 2014, the confluence of Debtor's shortage of free cash flow to service debt, combined with the continued drop in the price of oil and work volume reduction created defaults with secured creditors, and extended terms with unsecured creditors.

***Debtor's pre-bankruptcy business changes:***

22.  In 2015, Debtor implemented significant recovery initiatives.

23.  For example, the Sooner operation was idled in May 2015 to downsize and reduce overhead, and in late April 2015, the Sooner corporate entity was formally merged into Debtor.

24.  Further, Debtor has reduced its labor costs by downsizing from 140 full time employees to a current level of approximately 46 full-time employees, 38 of which are paid on an hourly basis, and 8 who are salaried.

25.  Also, Debtor's previous expansion included a business model of selling all needed specialized services to every oilfield operation that requested those services.  The steep decline in oil prices made that model unprofitable.  Therefore, Debtor has

terminated those expanded sales and has returned to selling only its original core services to its home market geography.

26.    In addition, Debtor has re-structured the specialized maintenance service that it does offer, which will increase contribution margins and eliminate unprofitable service offering.

27.    This retrenched business model has greatly reduced Debtor's indirect and overhead expenses.

28.    Additionally, with the steps taken by Debtor to downsize, Debtor no longer has any need for certain leased equipment and certain leased non-residential real property, which Debtor will seek to reject in bankruptcy.

29.    The business changes made by Debtor are expected to continue to deliver a positive and improving EBITDA.

***Debtor's Secured Debt Structure:***

30.    Until 2014, Debtor had only about $1.8 million in secured debt for property and assets, and was virtually self-financed for all working capital needs.

31.    In early 2014, Steve Ambrose, took on personal notes for the Sooner acquisition.  In addition Debtor took notes with Ally Ford Credit, John Deere and the likes for new maintenance service trucks and equipment to assist with the growth of the Debtor's maintenance services.

32.    In August 2014, BancFirst, through an SBA backed loan, provided the lending necessary for the asset purchase of Grizz Trucking.  Currently, BancFirst holds

security interests in certain of Debtor's rolling stock, and is currently owed approximately $890 thousand.

33.    Additionally, at the beginning of 2015, Debtor purchased new trailers with secured financing from Volvo Financial, who took security interests in the subject trailers purchased. Debtor owes approximately $245 thousand to Volvo Financial.

34.    Upon commencement of my engagement in December 2014, I worked with the Debtor, its officers and its advisors under an accelerated timeframe to assess and determine the availability of broader financing. In particular, I worked with the Debtor to discover prospective both primary and secondary lenders. I presented detailed planning with Arvest Bank, First United, Oklahoma State Bank, Banc First, Chase Morgan Bank, Bank of Oklahoma, and First Capital with such potential lenders, but was unable to locate suitable financing amounts or terms.

35.    Finally, on or about February 5, 2015, Debtor began discussions regarding lending options with VFP Asset Funding, LLC ("VFP"), an asset backed lender. The financing terms proposed by VFP were the best financing available to the Debtor, given the circumstances. While I have continued to look for alternate financing parties, to date no other party has provided the Debtor with an alternative financing proposal.

36.    Thus, on April 24, 2015, Debtor and VFP entered into the Loan and Security Agreement by and between VFP Asset Funding LLC, as Lender, and Ambrose Construction and Roustabout Service, LLC as Borrower (the "VFP Loan Agreement"). The VFP Loan Agreement included two components. The first was a $4,100,000.00 term loan (the "Term Loan"), and the second was a revolving line of credit in the maximum

amount of $3,000,000.00 (the "Revolving Loans"), both of which were secured by all of Debtor's assets not already secured by BancFirst or by Volvo Financial.

37.   Under the terms of the VFP Loan Agreement, VFP advanced funds to Debtor based on 85% of qualifying accounts receivable.  This lending model was in effect at the time Debtor filed bankruptcy.

38.   The VFP Loan Agreement allowed Debtor to restructure its debts, and resulted in the reduction of Debtor's monthly debt service by approximately $80 thousand per month.

39.   Debtor currently owes VFP approximately $4.43 million.

40.   Secondary (subordinated) secured lenders as of September 30, 2015, consist only of Don Rice and Floyd Wright, who are the original shareholders of Sooner, and who are currently owed a total of approximately $816 thousand.

***Unsecured Debt Structure:***

41.   Debtor has approximately 145 unsecured creditors and vendors, owed an aggregate of approximately $3.6 million as of September 13, 2015.

***Debtor's Need for Post-Petition Financing:***

42.   DIP Financing is necessary given Debtor's liquidity position and funding requirements. Debtor needs immediate access to credit in order to pay employees, vendors, customers and suppliers, as well as to make necessary capital expenditures to maintain its operations and provision of service, and to preserve value as it moves forward with reorganization. Without such immediate access to financing, Debtor will

lose the ability to timely capture substantial revenues from its pre-bankruptcy restructuring efforts already in progress that will maximize value for all stakeholders.

43.    When it became clear that bankruptcy was necessary to aid in the rehabilitation of Debtor's business, I began looking for what would become postpetition financing. I spoke with VFP, First United Bank, BancFirst, and Arvest Bank.

44.    The only party willing to lend to Debtor postpetition, in the amount and under the terms needed by Debtor, was VFP.

45.    The proposed DIP Financing offered by VFP represents the best financing available to the Debtor, given the circumstances. While Debtor has continued to look for other possible lenders, to date no other party has provided the Debtor with an alternative financing proposal.

46.    17.    After spirited negotiations, Debtor and VFP were ultimately able to agree on a term sheet for the provision of the DIP Financing (described below). The negotiations were conducted vigorously and at arm's-length.

**The terms of the dip facility are the best available under current market conditions:**

47.    In summary, VFP (the "DIP Lender") will provide a senior secured priming, superpriority debtor-in-possession lending comprised of a two-draw term loan in an aggregate principal amount of $250,000.00, as well as a revolving loan not to exceed an aggregate principal amount of $1,500,000, with such funds to be used pursuant to that certain interim budget attached hereto (the "DIP Financing"). The terms of the DIP Financing are detailed and described in the DIP Motion and are adopted and incorporated as if fully set forth herein.

48.     Under the terms of the DIP Facility, the DIP Lender will receive (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, superpriority claim status, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all property of the Debtor and the Debtor's estate that is not subject to valid, perfected and non- avoidable liens in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code, (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on certain property of the Debtor and the Debtor's estate that secures the obligations of the Debtor under or in connection with that DIP Financing.

49.     In light of current market conditions, Debtor's urgent need for liquidity, and within the context of other financing alternatives available, the terms and costs of the DIP Financing are the best available under the current circumstances, and the terms are reasonable under the circumstances as well.

***Debtor's Ordinary Course Cash Management System:***

50.     Prepetition, Debtor used the following four bank accounts to comply with its loan obligations to VFP ( "Cash Management System"):

| Bank | Account Type |
|---|---|
| BMO Harris Bank | Lockbox |
| Bank of the Panhandle | Deposit |
| First United Bank | Operating |
| First United Bank | Payroll |

51.    The BMO Harris Bank account serves as the primary collection point for much of the funds moving through the Cash Management System; it is a lockbox for VFP (the "Lockbox"). All Debtor's income - except from Devon Energy – is received directly into this account. The Lockbox account is owned VFP, for the benefit of Debtor.

52.    The Bank of the Panhandle deposit account (the "Deposit Account") is the account into which income from Devon Energy is deposited. Once deposited, it is immediately transferred into the Lockbox.

53.    When the Debtor requires cash to pay payroll or other expenses, the Debtor submits a loan authorization request to VFP for funds to be released in an amount necessary to cover the specified expenditures. VFP then instructs BMO Harris to deposit funds into Debtor's operating account at First United Bank (the "Operating Account"), which Debtor then uses to pay vendors, and cover all other general operating expenses.

54.    Funds from the Operating Account are also placed into the payroll account at First United Bank, which are then used to fund payroll payments and fees of Paychex, Debtor's third party payroll service (the "Payroll Account"). The Payroll Account is used to fund payroll payments and fees of Paychex, Debtor's third party payroll service.

55.    A diagram of Debtor's Cash Management System is as follows:

Ambrose Construction & Roustabout Services Cash Management System-    Legend -Operating Cycle ---Lending Cycle



56.    The Debtor carries little balance in either the Operating Account or the Payroll Account.

57.    Through the use of the Accounts for receipts and disbursements, the Cash Management System allows the Debtor to effectively manage its cash needs, service its debts, and protect VFP's secured interests in the Lockbox.

58.    Transitioning to a new cash management system would cause the Debtor to incur additional costs and deplete assets of the estate without providing any benefit to the Debtor's creditors. Under the circumstances, the maintenance of the Cash Management System is both essential to the Debtor's business and in the best interests of the Debtor's estate.

59.    I have been advised that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise administration of Chapter 11 cases. I have been advised that these guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for payment of taxes including payroll; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number and the type of accounts. I believe that implementing these guidelines would require a substantial modification, if not abandonment, of Debtor's prepetition banking operation.

60.    The requirement that Debtor close all existing accounts and open all new accounts would disrupt Debtor's operations and result in delays in payments to employees, customers and creditors thereby impeding Debtor's ability to ensure as smooth a transition into Chapter 11 as possible. Debtor proposes to change the style of the Bank Accounts to include designation as debtor-in-possession accounts while maintaining existing account numbers and the ability to use existing checks.

***Critical Vendors:***

61.    Critical vendors are those who provide Debtor with practically irreplaceable services and products required for Debtor's business.

62.    Debtor's critical vendors include UnitedHealthcare Insurance Company ("United"), AT&T U-Verse ("U-Verse"), AT&T Mobility ("Mobility"), Verizon Wireless ("Verizon"), Sudden Link, and KanOkla Networks ("KanOkla").

63.    It is Debtor's business judgment that payment of the above critical vendors' pre-petition claims to ensure that they are willing and/or able to provide post-Petition Date services and benefits to the Debtor is in the long term best interest of its estate and Debtor's reorganization efforts so long as the Critical Vendors extend Debtor unsecured post-petition credit.

***Prepetition Wages Owed:***

64.    As more fully set forth below, debtor owes certain prepetition obligations to and on behalf of its hourly and salaried employees (collectively the "Employees"). These prepetition obligations may include, but are not limited to: **(a)** amounts owed to the Employees for wages, salaries, and other accrued compensation, as well as third party payroll processing fees (collectively "Prepetition Compensation"); **(b)** all Employee benefits including but not limited to health related insurance, disability benefits, workers' compensation benefits, accidental death and dismemberment benefits, 401(k) plan contributions and life insurance, if any (collectively, the "Prepetition Benefits"); and **(c)** federal, state and local payroll-related taxes and insurance deductions and withholdings, such as FICA, FUI, and SUI, as well as workers' compensation premiums and amounts due to other third parties for garnishments and the like (collectively, the "Third-Party Obligations").

65.    Debtor requests authority, but not direction, to pay any and all Prepetition Compensation, Prepetition Benefits, and Third-Party Obligations (collectively the "Prepetition Employee Obligations").

66.    To assist in the implementation of the relief requested, Debtor further requests that its banks be authorized to honor: (i) prepetition payroll checks, wires, or other electronic transfers, and (ii) all other checks, wires, or other electronic transfers issued for payments sought to be approved by this Motion, regardless of whether such checks, wires, or other electronic transfers were drawn or initiated prior to or after the Petition Date. Debtor also seeks authorization to reissue prepetition checks, wires, or other electronic transfers for payments approved by this Motion that are dishonored or not completed notwithstanding such authorizations.

67.    As of the Petition Date, Debtor estimates that the following have accrued and become payable in the approximate amounts of:

| | | |
|---|---|---|
| (a) | Prepetition Compensation: | $108,736.56 |
| (b) | Prepetition Benefits: | $   8,908.12 |
| (c) | Third-Party Obligations: | $ 28,289.72 |
| | **Total:** | **$145,834.40** |

68.    The Prepetition Employee Obligations are further described as follows:

**Prepetition Compensation:**

69.    Debtor presently has approximately 46 full time Employees, consisting of 8 salaried workers and 38 hourly workers. Debtor normally pays Employees bi-weekly at midnight on Monday for the two-week period ended the preceding Saturday. The Debtor

last issued payroll checks for the period covering September 20, 2015 through and including October 3 2015 at midnight on October 5, 2015.

70.    Because the current pay period began before the Petition Date, a portion of the wages and salaries for the current pay period represent prepetition debt of Debtor. Moreover, some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date. The gross outstanding Payroll Obligations is approximately $108,302.00.

**Prepetition Benefits:**

71.    Prior to the Petition Date, Debtor offered its Employees certain benefits, including, without limitation, medical and prescription benefits, vision benefits, and.

72.    The Prepetition Benefits are an integral and important part of each Employee's compensation package. Cessation of these benefits would have a negative impact on the Employees and would undermine Debtor's operations.

73.    Debtor estimates that the aggregate amount of Prepetition Benefits is approximately 8,908.12.

74.    Accordingly, Debtor respectfully requests authority to pay the Prepetition Benefits, including any outstanding pre-petition amounts, for the Employees and their eligible dependents in the ordinary course of Debtor's business when such obligations become due.

**Third-Party Obligations:**

15

75.     During each applicable pay period, Debtor routinely deducts certain Third Party Obligations from Employee paychecks, including, without limitation garnishments for child support and similar deductions, other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans, and other miscellaneous deductions and contributions for Employee benefits.

76.     Debtor is also required by law to withhold from an Employee's wages amounts related to various taxes, including federal, state, and local income taxes, for remittance to the appropriate federal, state, or local taxing authorities.  Similarly, Debtor is required to pay unemployment taxes quarterly.

77.     Debtor also maintains Workers' Compensation coverage for its Employees pursuant to the existing schemes and mechanisms in place in the respective states in which Debtor operates.  Debtor processes these claims through established procedures under applicable state law in the ordinary course of its businesses.

78.     Debtor estimates that the gross amount of Third Party Obligations which remain unpaid as of the Petition Date is approximately $28,289.72.

79.     The Debtor believes that immediate payment of the Prepetition Employee Obligations is critical (i) to the ongoing operation of the Debtor's business and (ii) to avoid irreparable harm to the Employees and the reorganization efforts of Debtor.

80.     If the Prepetition Employee Obligations are not paid, the Debtor will risk tangible and intangible loss of the value of its business, including, among other things, losses relating to the cost of replacing Employees who seek alternative employment and losses related to the disruption of, and lower productivity in, the Debtor's business.

16

81.   In light of the above, it is in the best interests of the Debtor, of creditors, and of Debtor's estate for the Court to give its authority, but not direction, to pay any and all Prepetition Employee Obligations.

***Utilities:***

82.   Several Utilities provide the Debtor with traditional utility services, such as telephone and communication services, electricity, water, sewer, gas, and other similar services that are necessary for the continued operation of the Debtor's day-to-day business operations.

83.   A list of all identified Utilities is attached hereto as Exhibit "A" (the "Utility Service List").  I have made a good-faith effort to identify all Utilities and list them on the Utility Service List.

84.   In some cases, the Debtor may have paid a security deposit to a Utility.

85.   Uninterrupted utility service is critical to the ability of the Debtor to operate and maintain the value of its business and to maximize the value for the benefit of the creditors.  The Debtor could not operate its business without utility service.  Should any Utility refuse or discontinue service, the Debtor could be forced to cease or limit operations.  Such a cessation would substantially disrupt operations and result in loss of revenues, which would irreparably harm the Debtor.

I declare under penalty of perjury under 28 U.S.C. §1746 that the above and foregoing is true and correct.

_____

Darryle Cromwell