IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

IN RE:

AMBROSE CONSTRUCTION AND
ROUSTABOUT SERVICE, LLC,

Debtor.

Case No. 15-13956-JDL

(Chapter 11)

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 107(B), 361, 362, 363, 364 AND 507(I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING, WITH BRIEF AND WITH <u>NOTICE OF OPPORTUNITY FOR HEARING</u>**

**YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THIS DOCUMENT CAREFULLY AND CONSULT YOUR ATTORNEY ABOUT YOUR RIGHTS AND THE EFFECT OF THIS DOCUMENT.** A HEARING WILL BE CONDUCTED ON THIS MATTER AT THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA, OLD POST OFFICE BUILDING, 215 DEAN A. MCGEE AVENUE, OKLAHOMA CITY, OKLAHOMA. IF YOU DO NOT WANT THE COURT TO GRANT THE REQUESTED RELIEF, YOU MUST FILE A WRITTEN RESPONSE OR OBJECTION SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA, 215 DEAN A. MCGEE AVENUE, OKLAHOMA CITY, OK 73102. IN ADDITION TO FILING YOUR RESPONSE WITH THE CLERK, YOU MUST SERVE A FILE-STAMPED COPY OF YOUR RESPONSE OR OBJECTION ON THE SIGNING ATTORNEY AND TO ANY OTHER PARTY SPECIFIED. IF NO RESPONSE OR OBJECTION IS TIMELY FILED, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED WITHOUT HEARING.

EMERGENCY RELIEF AND AN EXPEDITED HEARING HAVE BEEN REQUESTED. IF THIS COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS TIME TO RESPOND. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE WITH THE CLERK OF THE

1

BANKRUPTCY COURT AND IMMEDIATELY SERVE A COPY OF YOUR RESPONSE ON COUNSEL FOR THE DEBTORS AND ON ANY OTHER PARTY SPECIFIED.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

Ambrose Construction and Roustabout Service, LLC, debtor and debtor-in-possession in the above-captioned case (the "**Debtor**"), hereby files this emergency motion (the "Motion") for entry of interim and final orders pursuant to Bankruptcy Code Sections 105, 107(b), 361, 362, 363, 364 and 507 (i) approving postpetition financing, (ii) authorizing use of cash collateral; (iii) granting liens and providing superpriority administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay, and (vi) scheduling a final hearing.  In support of this Motion, the Debtor relies on the Declaration of Omni Business Consultants, LLC, in Support of Debtor's Chapter 11 Petition and First Day Motions (the "**First Day Declaration**").[1]  In further support of this Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Debtor's business heavily depends on liquidity and the availability of cash flow.  Debtor has been struggling due to the substantial drop in and sustained low oil and natural gas prices in the recent past.  Based on Debtor's current capital structure, liquidity constraints, and inability to raise new capital, it has become necessary for Debtor to seek chapter 11 protection in order to protect and preserve its going concern value and to

---

[1] Capitalized terms used herein and not otherwise defined have the meaning set forth in the First Day Declaration.

ATL 20892955v2

reorganize its operations and its debts. Debtor has determined that this is the best way to ensure that the maximum value of its assets will inure to the benefit of its stakeholders.

2.     After good-faith, arm's-length negotiations, Debtor reached an agreement with VFP Asset Funding LLC ("**VFP**" or, in its capacity as lender under the DIP Loan Agreement, the "**DIP Lender**") to provide DIP Financing (defined below).

3.     As outlined in the First Day Declaration, the Debtor engaged in a competitive, arm's-length process in securing this financing with prospective alternative DIP lenders but was unable to secure a commitment for a loan with better, or even similar, terms.

4.     The DIP Financing shall be comprised of a two-draw term loan in an aggregate principal amount of $250,000.00, as well as a revolving loan not to exceed an aggregate principal amount of $1,500,000 (the actual available principal amount at any time being subject to conditions precedent as set forth herein and in the DIP Loan Agreement, as defined below), to be advanced on a superpriority administrative claim basis and to be secured by a first priority lien against all of the Debtor's unencumbered property and assets and a priming lien against certain of the Debtor's assets that are encumbered on the Petition Date (subject to exceptions for certain prepetition liens as described below). The DIP Financing will allow the Debtor to continue its operations while reorganizing its operations and its debts. The Debtor seeks immediate authority to borrow as needed under the DIP Loan Agreement on an interim basis pursuant to the Interim Order.

ATL 20892955v2

5.     The Debtor further seeks immediate authority to use the Cash Collateral of the Pre-Petition Lender (defined below) to support the Debtor's working capital needs throughout this case.   The claims of the Pre-Petition Lender are referred to herein collectively as the "Prepetition Obligations." The Prepetition Lender has consented to the DIP Financing and the Debtor's continued use of Cash Collateral on the terms set forth herein and in the DIP Orders.

6.     Immediate access to the DIP Financing will enable the Debtor to continue to operate its business and to exit this reorganization successfully.   Accordingly, the Debtor submits that the DIP Financing should be approved.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtor's Chapter 11 Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

8.     The statutory predicates for the relief sought hereby are Sections 105, 361, 362, 363, and 364 of title 11, United States Code (the "Bankruptcy Code"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTUAL BACKGROUND

9.     On October 14, 2015 (the "Petition Date"), the Debtor filed its voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Oklahoma (the "Bankruptcy Court") commencing this Chapter 11 Case.

ATL 20892955v2

10.    The Debtor continues to operate its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The U.S. Trustee has not yet appointed any official committees in this case, and no request has been made for the appointment of a trustee or examiner.

11.    A description of the Debtor's business, the reasons for filing this Chapter 11 Case and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the First Day Declaration [Dkt.No 2] which was being filed contemporaneously with this Motion.  The Debtor hereby adopts and incorporates such First Day Declaration as if fully set forth herein.

## RELIEF REQUESTED

12.    The Debtor respectfully requests that the Court approve entry by the Debtor into the DIP financing proposed hereby (the "DIP Financing").  Attached hereto as **Exhibit "A"** is a copy of the proposed Debtor-In-Possession Loan and Security Agreement, by and between VFP Asset Funding LLC, as Lender, and Ambrose Construction and Roustabout Service, LLC, Debtor and Debtor in Possession, as Borrower (as modified from time to time, the "**DIP Loan Agreement**").[2]  On an interim basis, the Debtor request entry of an order approving an Interim DIP Financing comprised of a two-draw term loan in an aggregate principal amount of $250,000.00, as well as a revolving loan not to exceed an aggregate principal amount of $1,500,000, with

---

[2]    The statements contained in this Motion are meant to be a summary of certain terms and conditions set forth in the DIP Loan Agreement and the DIP Orders.  To the extent statements made in this Motion are inconsistent with those terms and conditions, the DIP Loan Agreement and the DIP Orders shall control.

ATL 20892955v2

such funds to be used pursuant to that certain interim budget attached hereto.[3]  Attached hereto as **Exhibit "B"** is the proposed interim budget.  A proposed order granting the interim relief approving the Interim DIP Financing is attached as **Exhibit "C"** (the "**Interim Order**").

## SUMMARY OF KEY PROVISIONS

13.    Key provisions of the DIP Loan Agreement include:

- **DIP Financing**[4]

    The DIP Financing shall be comprised of a two-draw term loan (the "**DIP Term Loan**") in an aggregate principal amount of $250,000.00, as well as a revolving loan not to exceed an aggregate principal amount of $1,500,000 (the actual available principal amount at any time being subject to conditions precedent as set forth herein and in the DIP Loan Agreement, as defined below) (the "**DIP Revolving Loan**"), all to be advanced on a superpriority administrative claim basis and to be secured by a first priority lien against all of the Debtor's unencumbered property and assets and a priming lien against certain of the Debtor's assets that are encumbered on the Petition Date (subject to exceptions for certain prepetition liens as described below).

    The proceeds of the DIP Financing (but not proceeds of DIP Collateral) shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to pay (a) all fees due to the Pre-Petition Lender and the DIP Lender as provided under the DIP Loan Agreement, and (b) all reasonable out-of-pocket professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lender in connection with the Case, including, without limitation, those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Loan Agreement, and related pleadings and agreements, (ii) to provide working capital to the Borrower, (iii) for other general corporate purposes of the Borrower consistent with

---

[3]    A budget covering the amounts to be advanced under the DIP Facility for the period after the period covered by the Initial Budget will be filed in advance of a final hearing.

[4]    Capitalized terms used in this section describing the terms of the DIP Financing and not otherwise defined have the meaning set forth in the DIP Loan Agreement.

ATL 20892955v2

the DIP Budget and not otherwise prohibited under the DIP Loan Agreement or the DIP Order, including for permitted capital expenditures, (iv) to pay administration costs of the Case consistent with DIP Budget, and, to the extent approved by the Bankruptcy Court, on notice to and in consultation with the Lenders, to pay certain prepetition trade payables or amounts due under an employee retention plan, but in either case only to the extent expressly provided for in DIP Budget and in an amounts and on terms otherwise consented to by the DIP Lender, (v) to pay professional expenses, subject to any limitations in the DIP Order, of any official creditors' committee, if any such a committee is appointed in the Case, consistent with DIP Budget, and (vi) to pay professional expenses, subject to any limitations in the DIP Budget, of the Debtor.

- **Availability**

Interim Facility:  Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of the other conditions precedent set forth in the DIP Loan Agreement, $200,000 of the DIP Term Loan and DIP Revolving Loans up to the amounts set forth in the DIP Budget, subject to the existence of Availability (as defined in DIP Loan Agreement), shall be available to the Debtor.

Full Availability:  Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), and satisfaction of any other conditions precedent, the full remaining $50,000 of the DIP Term Loan and DIP Revolving Loans up to the amounts set forth in the DIP Budget, subject to the existence of Availability (as defined in DIP Loan Agreement), shall be available to the Debtor.

- **Priority and Liens/Ranking/Security/Collateral**

Priority/Collateral. All obligations of the Debtor to the DIP Lender under the DIP Financing ("**DIP Obligations**"), including all loans and other extensions of credit made under the DIP Financing, shall, subject to the Carve-Out (as defined below), at all times:

(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to super-priority administrative expense claim status in the Chapter 11 Case, which claims in respect of the DIP Financing shall be superior to all other claims, other than the Carve-Out and the Adequate Protection Claim (defined below), and shall not be subject to discharge under Bankruptcy Code section 1141;

7

(b) pursuant to Bankruptcy Code section 364(c)(2), has a first priority lien on any of the Collateral which is not encumbered by valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date other than Avoidance Actions (as defined in the Interim Order);

(c) subject to clause (d) below, pursuant to Bankruptcy Code section 364(c)(3), has a junior lien on all Pre-Petition Collateral, DIP Collateral, Cash Collateral, including, without limitation, cash, inventory, accounts, accounts receivable, other rights to payment or refund whether arising before or after the Petition Date, contracts, equipment, goods, general intangibles, documents, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, deposit accounts, investment property, letter of credit rights, fixtures, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing, that is subject to the Pre-Petition Liens, any Prior Liens, or any other lien or security interest; and

(d) pursuant to Bankruptcy Code section 364(d), has a first priority priming lien on all pre-petition and post-petition assets of the Debtor that were subject to a lien under the Prepetition Obligations. The priming liens described herein shall be senior to any liens and security interests that were granted as of the Petition Date, but which were not permitted under the Debtor's prepetition credit facility with Pre-Petition Lender, but shall be subordinate to (i) Prior Liens, (ii) the Pre-Petition Liens, (iii) the Adequate Protection Liens, (iv) any valid, perfected and unavoidable security interests in such assets arising out of liens to which the liens of the DIP Lender become subject after the Petition Date solely as permitted by Section 546(b) of the Bankruptcy Code, and (v) the Carve-Out.

(e) The liens described in clauses (b) through (d) above shall be referred to as the "**DIP Liens**".

- **Waiver of Section 506(c)**

No person or entity shall be entitled, directly or indirectly, to, except as expressly provided by paragraph 34 of the Interim Order, and paragraph 11 of the Interim Order with respect to the Carve-Out, charge or recover from the Collateral, whether by operation of section 506(c) of Bankruptcy Code,

ATL 20892955v2

sections 105 or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property (as defined in the Interim Order) after an Event of Default

- **Carve-Out**

The DIP Obligations, attendant liens and super-priority claims described in the DIP Loan Agreement, the Interim Borrowing Order and the Final Borrowing Order shall be subject in each case to the Carve-Out, which is defined in ¶ 11 of the Interim Order as:

11.  *Carve-Out.* Notwithstanding anything to the contrary contained in this Order, upon the occurrence of the Termination Date, the liens and claims granted to any of the DIP Lender or Pre-Petition Lender in this Interim Order, the DIP Loan Documents, and/or the Pre-Petition Loan Documents shall be subject to the payment, without duplication, of the following fees and claims (collectively, the "**Carve-Out**"), but only to the extent that there are not sufficient, unencumbered funds in the Debtor's estates to pay such amounts at the time payment is required to be made:

(a)  with respect to claims incurred prior to the Termination Date, the claims of (x) professionals of the Debtor whose retention is approved by this Court during the Chapter 11 Case pursuant to Sections 327 and 328 of the Bankruptcy Code (the "**Debtor's Professionals**") for unpaid fees and expenses which were incurred in accordance with the DIP Budget on and after the Petition Date and during the month in which the Termination Date occurs; and (y) professionals of any statutory committees appointed in the Cases (any such committee, a "**Committee**") whose retention is approved by this Court during the Cases pursuant to Section 1103 of the Bankruptcy Code (such professionals, the "**Committee's Professionals**" and together with the Debtor's Professionals, the "**Retained Professionals**") for unpaid fees and expenses which were incurred in accordance with the DIP Budget on and after the Petition Date and during the month in which the Termination Date occurs; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, comply with the DIP Budget and are not excluded from the Carve-Out under paragraph 17 of this Order (such fees and expenses, the "**Pre-Termination Date Expenses**" and the permitted amount thereof, the "**Carve-Out Amount**"); and

(b) unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.

- **Adequate Protection for the Pre-Petition Lender**

The Pre-Petition Lender, under or in connection with the Obligations and the Pre-Petition Obligations, shall be granted the following adequate protection liens and claims (collectively, the "**Adequate Protection Provisions**"), pursuant to sections 361(2), 507, 362, 363(c)(2), and 363(e) of the Bankruptcy Code or otherwise, on account of the diminution in the value (each such diminution, a "**Diminution in Value**") of the pre-petition security interests of the Pre-Petition Lender, whether or not such Diminution in Value results from the sale, lease or use by the Debtor of the Collateral securing the Obligations (including, without limitation, cash collateral):

(a) <u>Adequate Protection Liens for all Obligations</u>. To the extent set forth in the Interim Borrowing Order or Final Borrowing Order (whichever is applicable at any given time), pursuant to Section 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, all of Pre-Petition Lender's claims for Diminution in Value are secured by a perfected lien and security interest in all assets of the Debtor whether acquired before or after the Petition Date (the "**Adequate Protection Liens**"). The Adequate Protection Liens shall be subordinate only to Prior Liens (as defined in the Financing Orders) and the Carve-Out.

(b) <u>Adequate Protection Payments</u>. Unless otherwise directed by Lender while a Default or Event of Default exists, Borrower shall be permitted to make adequate protection payments to Pre-Petition Lender in accordance with the Financing Orders.

(c) <u>Super-Priority Claim</u>. The Pre-Petition Lender shall have an allowed super-priority administrative expense claim (the "**Adequate Protection Claim**") against the Debtor and their estates in amount not to exceed the Adequate Protection Obligations (defined below). No cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in the Case or any Successor Case, whether

for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or pari passu with, the Adequate Protection Claim.

(d)     Fees and Expenses.  Debtor shall pay all fees set forth in the Pre-Petition Loan Agreement (as defined in the Interim Order).

(e)     Interest.  All obligations, including accrued but unpaid interest, including default interest, on the Pre-Petition Obligations shall continue to accrue on the terms thereof.

- **Automatic Perfection**.

  The liens and security interests granted to VFP pursuant to the provisions of the DIP Loan Agreement and the Financing Orders shall be in addition to all Liens conferred upon VFP pursuant to the terms of the Financing Orders.  The Interim Borrowing Order, and, if and when it becomes effective, the Final Borrowing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of VFP's liens upon the Debtor's assets, including, without limitation, the Adequate Protection Liens and the DIP Liens, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the liens of VFP in and to the Debtor's assets or to entitle VFP to the priorities granted herein.

- **Financial Reporting**.  In addition to such reporting required under the DIP Loan Agreement, on the second business day of each week, Debtor shall provide the DIP Lender with (i) a 13 week cash flow on a weekly basis, and (ii) a variance report providing a comparison between the Debtor's actual income and expenditures and the Debtor's projected income and expenditures as set forth in the DIP Budget for immediately preceding week.

- **Interest**.

  Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each advance owing to DIP Lender from the date of such

11

advance until such principal amount shall be paid in full, at the following rates per annum:

> (i)    Revolving Loan Advances.    These advances will accrue interest at a rate of 8.50% in excess of LIBOR.

> (ii)    Term Loan Advances.    These advances will accrue interest at a rate of 10%.

Default Interest.    The interest rates above shall increase by 3% upon default.

- **Fees**

Unused Line Fee.  Borrower shall pay to Lender monthly an unused line fee at a rate equal to one percent (1.00%) per annum, applied to the amount by which the Maximum Line Amount exceeds the average daily principal balance of the outstanding Revolving Loans during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding, which fee shall be payable in arrears on the first (1st) day of each month and on the Termination Date.

Termination Fee.  For services performed by Lender in connection with Lender's continuing administration hereof, upon the occurrence of the Termination Date for any reason, Borrower shall pay to Lender on the Termination Date a fee in the amount equal to the greater of (i) $45,000, and (ii) 3.00% of the Maximum Line Amount.

Collateral Monitoring Fee.   Borrower shall pay to Lender a monthly collateral monitoring fee of $500, payable in advance on the Agreement Date and on the first day of each month thereafter; provided, however, that Lender shall be deemed to have fully earned such fee as of the day immediately preceding such payment due date.

Other Fees:  Current cash payment of all reasonable out-of-pocket expenses incurred by the Lender for field examinations, appraisal fees, costs of legal counsel, and other fees as may appear in the DIP Loan Agreement.

- **Indemnity**

Borrower shall indemnify and hold Lender and its Affiliates, and their respective directors, agents, employees and counsel, harmless from and against any and all losses, claims, damages, liabilities, costs or expenses

12

imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Loan Documents, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion which it is permitted to pay under applicable law to Lender in satisfaction of indemnified matters under this Section.

- **Termination Date**

  The DIP Loan Agreement shall terminate the earliest of (a) the Maturity Date (which is the six month anniversary of the DIP Loan Agreement Date, (b) the date Borrower terminates the revolving credit facility contemplated hereby, (c) the date the Obligations are accelerated pursuant to Section 10(b), (d) the effective date of any Acceptable Plan or the date of entry of a Confirmation Order with respect to any other Reorganization Plan, (e) the date of closing of any sale of all or substantially all of the Collateral, or (f) the occurrence of an Event of Default unless otherwise waived by DIP Lender.

**B.    The Debtor's Efforts to Obtain Postpetition Financing**

14.    As outlined in the First Day Declaration, the Debtor and its advisors approached seven (7) sources regarding potential prepetition financing, other than VFP. None of those sources offered comparable financing.

15.    When it became clear that bankruptcy was necessary to aid in the rehabilitation of Debtor's business, I began looking for what would become postpetition financing. I spoke with VFP, First United Bank, BancFirst, and Arvest Bank. The only party willing to lend to Debtor postpetition, in the amount and under the terms needed by Debtor, was VFP.

13

*ATL 20892955v2*

16.     The Debtor and its advisors, including Omni, analyzed in detail the final DIP Financing proposal.   Ultimately, the Debtor determined that VFP's offered DIP Financing was in the best interest of the Debtor.

## BASIS FOR RELIEF

**A.     The Debtor Should be Authorized to Obtain Postpetition Financing through the DIP Documents.**

    **i.     Entry into the DIP Financing Is an Exercise of the Debtor's Sound and Reasonable Business Judgment.**

17.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing.   11 U.S.C. § 364.   Courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit.   *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002*); In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

    **ii.     The DIP Financing Represents the Best Available Financing.**

18.     The proposed DIP Financing provides the Debtor and its estate the most favorable financing under the circumstances confronting the Debtor, and the Debtor's decision to enter into the DIP Financing was the result of an intensive effort by the Debtor and its professionals to obtain the best terms available in the market.   Indeed, the DIP Financing will provide the Debtor with the significant additional liquidity that it needs as the Debtor undertake the reorganization process.

14

19.     For these reasons, the Debtor submits that entry into the DIP Financing is in the best interests of the Debtor's creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtor's sound and reasonable business judgment.

### iii.     The Debtor Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

20.     To satisfy Section 364 of the Bankruptcy Code authorizes a debtor to obtain, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides that the Court may authorize a debtor to obtain credit or incur debt:

> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

21.     The requirements of Section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Says. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be

15

able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Says. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

22.     The Debtor attempted to secure financing on terms other than a secured superpriority basis, but given the Debtor's operational challenges, the downturn in oil and gas prices, and the recent nature of the previous loan with VFP, it was unable to do so. The Court should therefore authorize the Debtor to provide VFP a superpriority administrative expense status for any obligations arising under the DIP Financing as provided for in Section 364(c)(1) of the Bankruptcy Code.   This Court has previously granted superpriority administrative expense status in similar circumstances.   *In re Paul Transportation, Inc.*, Case No. 10-13022 (Bankr. W.D. Okla., May 20, 2010); *In re Roma Foods of Oklahoma, Inc.*, Case No. 09-12488 (Bankr. W.D. Okla., May 12, 2009); *In re Harold's Stores, Inc.*, Case No. 08-15027 (Bankr. W.D. Okla., November 10, 2008).

> **iv.    The Debtor Should Be Authorized to Obtain Postpetition Financing Secured, in Part, by First Priority Priming Liens.**

23.     In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property without the consent of the existing lien holders if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.   *See* 11 U.S.C. § 364(d)(1).

16

24.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by Section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002); *In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997); *Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2012).  The DIP Financing satisfies each of this factors.

25.     First, as described above, the Debtor and its advisors explored a variety of possible financing sources and ultimately determined that VFP offered the best option for obtaining the postpetition financing.  The Debtor and DIP Lenders negotiated the DIP Loan Documents in good faith and at arm's-length, and the DIP Loan Documents reflect the most favorable terms on which the DIP Lenders were willing to offer financing.

Adequate DIP financing structured so as to minimize execution risk was not available on other bases.

26.     Second, upon entry of the Interim Order, the DIP Financing will provide access to approximately $1.75 million in incremental liquidity, which the Debtor and its advisors has determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtor to maintain its operations and its relationships with key constituents notwithstanding the commencement of this case.    Accordingly, the terms of the DIP Financing are reasonable and adequate to support the Debtor's operations and restructuring activities through the pendency of this case.

27.     As described above, it is important to note that the only liens that the DIP Financing seeks to prime would be the liens that were not permitted liens under the Pre-Petition Loan Agreement (as defined in the Interim Order), not other valid and enforceable prepetition liens having priority over the Prepetition Secured Obligations. Courts in the 10th Circuit have granted priming liens in similar situations. *In re Plaza de Retiro, Inc.*, 2009 WL 3633356 (Bankr. D. N.M. Oct. 27, 2009)(granting relief at *7); *In re Utah 7000, LLC*, 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) (granting relief at *6); *In re Campbell Sod, Inc.*, 378 B.R. 647, 655 (Bankr. D. Kan. 2007).

> **v.     The Interests of the Prepetition Lender Are Adequately Protected.**

28.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. §

364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

29.     To account for any potential diminution in value, the Debtor will provide adequate protection to the holders of any liens that are primed.

a.     *Adequate Protection Liens*.  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, with respect to outstanding Pre-Petition Obligations, as adequate protection of the interests of the Pre-Petition Lender in the prepetition collateral against any diminution in value of such interests in the prepetition Collateral, the Debtor shall grant to the Pre-Petition Lender, continuing valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the Collateral.

b.     *Adequate Protection Payments.*  Unless otherwise directed by Lender while a Default or Event of Default exists, Borrower shall be permitted to make

adequate protection payments to Pre-Petition Lender in accordance with the Financing Orders.

          c.    *Automatic Perfection.*  The Liens granted to Lender pursuant to the provisions of the DIP Loan Agreement and the other Loan Documents shall be in addition to all Liens conferred upon Lender pursuant to the terms of the Financing Orders.  The Interim Borrowing Order, and, if and when it becomes effective, the Final Borrowing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of Lender's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of Lender in and to the Collateral or to entitle Lender to the priorities granted herein.

          d.    *Adequate Protection Superpriority Claims*.  As further adequate protection of the interests of the Pre-Petition Lender in the prepetition collateral against any diminution in value of such interests in the prepetition collateral, the Pre-Petition Lender shall be granted as and to the extent provided by Sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim.

     **B.**    **The Debtor Should Be Authorized to Use the Cash Collateral.**

    30.    Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, as follows:

20

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

31.    Further, Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id.* § 363(e).

32.    The Debtor satisfied the requirements of subsections (c)(2) and (e) of Section 363 of the Bankruptcy Code and should be authorized to use the Cash Collateral. The Pre-Petition Lender has consented to the use of the Cash Collateral. Accordingly, the Court should authorize the Debtor to use the Cash Collateral under Section 363(c)(2) of the Bankruptcy Code.

### C.    The Debtor Should Be Authorized to Pay the Fees Required by the DIP Lender

33.    As described above, the Debtor agreed to pay certain fees to the DIP Lender in exchange for its providing the DIP Financing. Specifically, the Debtor will pay: (a) shall pay to Lender monthly an unused line fee at a rate equal to one percent (1.00%) per annum, applied to the amount by which the Maximum Line Amount exceeds the average daily principal balance of the outstanding Revolving Loans during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any

21

of the Obligations are outstanding, which fee shall be payable in arrears on the first (1st)

day of each month and on the Termination Date; (b) for services performed by Lender in

connection with Lender's continuing administration hereof, upon the occurrence of the

Termination Date for any reason, Borrower shall pay to Lender on the Termination Date

a fee in the amount equal to the greater of (i) $45,000, and (ii) 3.00% of the Maximum

Line Amount; (iii) a monthly collateral monitoring fee of $500, payable in advance on

the Agreement Date and on the first day of each month thereafter; provided, however,

that Lender shall be deemed to have fully earned such fee as of the day immediately

preceding such payment due date; (iv) the fees and expenses of the professionals for the

DIP Lender; and (v) other miscellaneous fees as set forth in the DIP Loan Agreement.

The fees the Debtor has agreed to pay to the DIP Lenders and other obligations under the

DIP Term Sheet represent the most favorable terms to the Debtor on which the DIP

Lenders would agree to make the DIP Financing available.

34.    Courts routinely authorize debtors to pay fees similar to those the Debtor

proposes to pay, where the associated financing is, in the debtors' business judgment,

beneficial to the debtors' estates. *See*, *e.g.*, *In re MPF Holding US LLC*, Case No. 08-

36084 (Bankr. S.D. Tex. Feb. 18, 2009) (approving a commitment fee); *see also In re

InSight Health Servs. Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011)

(approving 2.0% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case

No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility

fee); *In re Lear Corp.*, Case No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving

5.0% upfront fee and a 1.0% exit/conversion fee); *In re Gen. Growth Props., Inc.*, Case

22

No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l Inc.*, Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *In re DJK Residential, Inc.*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing). Accordingly, the Court should authorize the Debtor to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

> **D.    The Scope of the Carve-Out is Appropriate.**

35.    The proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders and the adequate protection liens and claims to the Carve-Out.  Such carve-outs for professional fees has been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals.  *See*, *e.g.*, *In re Paul Transportation, Inc.*, Case No. 10-13022 (Bankr. W.D. Okla., May 20, 2010); *In re Roma Foods of Oklahoma, Inc.*, Case No. 09-12488 (Bankr. W.D. Okla., May 12, 2009); *In re Harold's Stores, Inc.*, Case No. 08-15027 (Bankr. W.D. Okla., November 10, 2008).  The Carve-Out is in a reasonable amount and ensures that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtor and the creditors' committee

23

notwithstanding the grant of superpriority and administrative liens and claims under the

DIP Financing and adequate protection liens and claims.

### E.   The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e).

36.   Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans,

even if the authority of the debtor to obtain such loans or grant such liens is later reversed

or modified on appeal.  Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization
> under this section [364 of the Bankruptcy Code] to obtain
> credit or incur debt, or of a grant under this section of a
> priority or a lien, does not affect the validity of any debt so
> incurred, or any priority or lien so granted, to an entity that
> extended such credit in good faith, whether or not such entity
> knew of the pendency of the appeal, unless such authorization
> and the incurring of such debt, or the granting of such priority
> or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

37.   As explained in detail herein and in the First Day Declaration, the DIP

Loan Documents are the result of the Debtor's reasonable and informed determination

that the DIP Lender offered the most favorable terms on which to obtain needed

postpetition financing, and of extended arm's-length, good faith negotiations between the

Debtor and the DIP Lender.  The terms and conditions of the DIP Loan Documents are

fair and reasonable and the proceeds of the DIP Financing will be used only for purposes

that are permissible under the Bankruptcy Code.  Further, no consideration is being

provided to any party to the DIP Loan Documents other than as described herein.

24

Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

### F.    Modification of the Automatic Stay is Warranted.

38.    The DIP Loan Agreement and the proposed Interim Order contemplate that the automatic stay shall be vacated and modified to allow the Pre-Petition Lender to take possession of the Pre-Petition Collateral Proceeds and to apply such amounts to the Pre-Petition Obligations, and the Debtor is hereby authorized and directed to take any and all action requested by the Pre-Petition Lender to facilitate the Pre-Petition Lender taking possession of such funds.  The DIP Loan Agreement and the proposed Interim Order also contemplate that upon the occurrence of the Termination Date, (i) the DIP Lender shall be fully authorized, in its sole discretion, to terminate the DIP Financing, to demand payment and satisfaction of all DIP Obligations, and shall be entitled to relief from the automatic stay as set forth in this Interim Order, and (ii) the Pre-Petition Lender shall be fully authorized, in its sole discretion, to demand payment and satisfaction of all Pre-Petition Obligations, and shall be entitled to relief from the automatic stay as set forth in this Interim Order. The Interim Order provides, however, that the DIP Lender must provide the Debtor with three (3) days' prior written notice before exercising any enforcement rights or remedies, which will entitle the Debtor and the creditors' committee to seek an emergency hearing with the Court for the sole purpose of contesting whether, in fact, an Event of Default has occurred and is continuing.

ATL 20892955v2

39.     Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtor's business judgment, are reasonable under the circumstances. *See*, *e.g.*, *In re Roma Foods of Oklahoma, Inc.*, Case No. 09-12488 (Bankr. W.D. Okla., May 12, 2009); *In re Voyager Exp.*, Inc., 2009 WL 7128643 (Bankr. D. Colo.). *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc.*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012.

**G.     The Debtor Requires Immediate Access to the Cash Collateral and DIP Financing.**

40.     The Court may grant interim relief in respect of a motion filed pursuant to Section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.

41.     The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtor to borrow up to $1.75 million under the DIP Financing is not granted promptly after the Petition Date.  *See* First Day Declaration.  The Debtor has insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Financing.

42.     Accordingly, the Debtor has an immediate need for access to the DIP Financing on an interim basis to continue the operation of its business, fund fees and

26

expenses necessary to obtain the DIP Financing, maintain its relationships with customers and meet payroll, all of which is required to preserve and maintain the value of the Debtor's assets for the benefit of all parties in interest.

43.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized by other courts in similar circumstances. *See*, *e.g.*, *In re Paul Transportation ,Inc.*, Case *No.* 10-13022 (Bankr. W.D. Okla., May 20, 2010); *In re Roma Foods of Oklahoma, Inc.*, Case No. 09-12488 (Bankr. W.D. Okla., May 12, 2009); *In re Harold's Stores, Inc.*, Case No. 08-15027 (Bankr. W.D. Okla., November 10, 2008);  *In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis); *In re MPF Holding US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 3, 2009) (same).  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtor's estates and is consistent with, and warranted under, subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001.

### H.    Request for Final Hearing.

44.    Pursuant to subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001, the Debtor request that the Court set a date that is no longer than thirty (30) days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.[5]

---

[5]    The DIP Loan Agreement and the Interim Order require that the Final Order is entered no later than thirty        (30) days after entry of the Interim Order.

45.     The Debtor request that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## REQUEST FOR WAIVER OF STAY

46.     The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtor's operations, value and ability to reorganize.  Accordingly, the Debtor submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

47.     Notice of this pleading has been provided by overnight delivery and electronic mail or facsimile to:  Notice of this pleading has been provided by overnight delivery and electronic mail or facsimile to:  (i) the Office of the United States Trustee; (ii) Bruckner Leasing Company, Inc., (iii) Debtor's 20 largest unsecured creditors; (iv) the Internal Revenue Service, (v) the Oklahoma Tax Commission, (vi) VFP Asset Funding, LLC., (vii) BancFirst; (viii) Volvo Financial Services; (xi) Don Rice, (xii) Floyd Wright, and (xiii) Cornerstone Land Development, LLC.  In light of the expedited

nature of the relief requested herein and the irreparable harm to the Debtor that may

ensue if the relief requested is not granted, the Debtor submit that no further notice need

be given and that the notice provided by the Debtor is sufficient.

## CONCLUSION

The Debtor respectfully requests that the Court (i) enter the Interim Order attached

hereto; (ii) set a final hearing on this Motion; and (iii) grant such further relief to which

the Debtor may be entitled.

Respectfully submitted,

/s/ Jeffrey E. Tate
J. Clay Christensen (OBA # 11789)
Jeffrey E. Tate (OBA #17150)
Jacob P. Jean (OBA #31392
Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma  73116
(405) 232-2020
(405) 236-1012 (facsimile)
clay@christensenlawgroup.com
jeffrey@christensenlawgroup.com
jacob@christensenlawgroup.com

PROPOSED ATTORNEYS FOR DEBTOR

ATL 20892955v2